**GRACE UNITED METHODIST CHURCH, Plaintiff,**

v.

**CITY OF CHEYENNE; City of Cheyenne Board of Adjustment; Dorothy Wilson, City of Cheyenne Development Director; and Cheyenne City Council, Defendants.**

No. 02–CV–035–B.

United States District Court,
D. Wyoming.

Dec. 16, 2002.

Samuel M. Ventola, Rothgerber Johnson & Lyons, Denver, CO, for plaintiff.

Mary B. Guthrie, Michael D. Basom, City Attorney's Office, Cheyenne, WY, for defendants.

## ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT

BRIMMER, District Judge.

This case arises out of Grace United Methodist Church's attempt to operate a day care facility with a component of religious instruction in contravention of the City of Cheyenne's land use regulations. The matter is currently before the Court on: (1) Plaintiff's Motion for Partial Summary judgment on its First Claim for Relief under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"); and (2) Defendant's Motion to Dismiss, which has been converted to a Motion for Summary Judgment. Upon reading the briefs, hearing oral argument, and being fully advised of the premises, the Court **FINDS** and **ORDERS** as follows:

### Statement of Parties and Jurisdiction

Plaintiff Grace United Methodist Church ("Plaintiff" or "Grace United") is a non-profit religious corporation that has been located in a residential area of Cheyenne, Wyoming since 1956. The area in which Plaintiff's church is located is zoned Low–Density Residential–Established ("LR–1"). (See Cheyenne Code, Appendix A–Zoning, § 41.100). With the Board of Adjustment's approval, operating a church in a LR–1 zoned area is a permissible land use. (See id. at § 41.113). Plaintiff is affiliated with the United Methodist Church, which is a worldwide Christian religious organization based primarily on holy scriptures and secondarily on the teachings of Reverend John Wesley. (Pl.'s Resp. to Defs.' Mot. to Dismiss and Pl.'s Mot. for Summ. J. ("Pl.'s Resp. Br."), Exh. A).

Defendant City of Cheyenne ("City" or "Cheyenne") is a municipality within the State of Wyoming. Defendant City of Cheyenne Board of Adjustment ("Board of Adjustment") has been delegated the power to hear and decide: (1) appeals from zoning determinations; and (2) special exceptions and variances from zoning ordinances. The creation, operation, powers, duties, and functions of the Board of Adjustment are established by statute. See Wyo. Stat. Ann. §§ 15–1–605 through 15–1–608. Defendant Dorothy Wilson, who has been sued in her official capacity, is the Development Director for Cheyenne. In this capacity Defendant Wilson is authorized to approve or disapprove of proposed uses of property within Cheyenne.

The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

### Background

A. Procedural Background.

On February 20, 2002, Plaintiff filed its Complaint. Plaintiff avers that Defendants: (1) violated RLUIPA by substantially burdening Plaintiff's religious exercise; (2) violated 42 U.S.C. § 1983 and the First Amendment by depriving Plaintiff of its rights to the free exercise of religion, freedom of speech, freedom of assembly, and freedom of association; (3) violated 42 U.S.C. § 1983 and the Fourteenth Amendment Due Process and Equal Protection Clauses by denying Plaintiff use of its property. (Pl.'s Compl., at ¶¶ 15–30). Plaintiff's request for relief seeks: (1) a preliminary and permanent injunction restraining Defendants from prohibiting Plaintiff's use of its property as a religious school and day care; (2) a declaration that

the City of Cheyenne zoning ordinance in question and the application of such ordinance is void and in violation of the law; and (3) compensatory damages, costs, and attorney's fees. (*Id.* at ¶ 30(a)-(d)).

On April 23, 2002, Defendants filed a motion to dismiss in lieu of filing an Answer. On May 20, 2002, Plaintiff filed its Response to Defendants' Motion to Dismiss and a Cross-Motion for Summary Judgment on its RLUIPA claim. On May 23, 2002, this Court converted Defendants' Fed.R.Civ.P. 12(b)(6) Motion to a Fed. R.Civ.P. 56 Motion and requested additional information from the parties. On May 31, 2002, the Court held an initial hearing on the parties' Motions for Summary Judgment. Subsequently, the Court ordered the parties to file supplemental briefs in support of their positions for summary judgment. On September 19 and 20, 2002, the parties filed their supplemental briefs with the Court. On November 25, 2002, the Court heard argument on the parties' supplemental briefs.

B. Background Relevant to the Parties' Claims.

Grace United Methodist Church is located in a Low Density Residential Established, LR-1, neighborhood in Cheyenne. (Pl.'s Compl. at ¶¶ 6-7). Reverend Jon Laughlin is the pastor at the church. One of the missions of Grace United is to educate children in the Christian faith. (*Id.* at ¶ 6).

Cheyenne has adopted a zoning ordinance that regulates land use within the city limits. (*See* Cheyenne Code, Appendix A-Zoning). The zoning ordinance permits the construction of churches in residential areas. (Pl.'s Compl. at ¶ 8). However, day care facilities over a certain size are not permitted in residential areas unless a variance is granted. (*Id.*). Nevertheless, Cheyenne permits the construction and operations of day cares in several

other areas of the City. (*Id.*). The Board of Adjustment is authorized to hear appeals from adverse zoning decisions. (*Id.* at ¶ 7).

Between 1998 and early 2000, Plaintiff decided to build an addition to its church and hired a licensed architect to develop plans for the addition. (Pl.'s Additional Br. in Supp. of Mot. for Summ. J. and in Resp. to Defs.' Mot. to Dismiss or for Summ. J., ("Pl.'s Suppl. Br."), Exh. A, at p. 4). The estimated cost of the addition was $687,000. (*Id.*). Reverend Laughlin testified that "the entire facility [i.e., the addition] was going to be used for child care." (*Id.*, at p. 18). Plaintiff planned to use revenue generated from a "child care" operation and a pledge campaign by members of the congregation to pay for overhead, staff expenses, and debt service on the loan associated with the addition. (*Id.* at pp. 16-17). In late 1998, or early 1999, Plaintiff approached the State of Wyoming about obtaining a license for a "day care or child care" facility. (*Id.* at p. 5).

In all its dealings with the City of Cheyenne prior to filing suit, Plaintiff referred to its proposed operation as a "day care" facility and not as a religious school. (*Id.* at pp. 22-24). In March 2001, Plaintiff submitted an application with the City of Cheyenne to establish a "day care" center at its church. (Pl.'s Resp. Br., Exh. B, at p. 1). The proposed operation would provide care for newborn to thirteen-year-old children. (*Id.* at p. 2). The facility would operate sixteen hours a day—between 6:00 a.m. and 12:00 a.m.—and would permit up to one hundred kids to enroll. (*Id.*; Pl.'s Resp. Br., Exh. C, at p. 37).

However, Cheyenne's Development Director, Defendant Wilson, denied the application for the "day care" license, thus preventing Plaintiff from operating the day care in its church building. (Pl.'s Comp. ¶¶ 9-10). Plaintiff appealed this adverse

decision to the Board of Adjustment. (*Id.* at ¶ 11). The Board of Adjustment denied the appeal, concluding: (1) the proposed day care facility could not be operated by Plaintiff in a residential area because it was not a church, primary or secondary school, or other similar use permitted in a LR–1 zoned area; (2) the Board was without discretion to grant Plaintiff's proposed day care; and (3) the proposed day care was incompatible with community goals and the neighborhood. (Pl.'s Resp. Br., Exh. B, at pp. 3–4). The Board also concluded that "the denial of the proposed day care does not impose a substantial burden upon Grace's religious exercise and that the City has a compelling governmental interest in protecting the integrity and sustaining the safety of the neighborhood." (*Id.* at p. 4, ¶ 8).

Plaintiff claims that the proposed "day care" was, in fact, a religious school designed to provide Christian education to children who would otherwise be placed in secular pre-school or day care because of prevalence of single parent families and families in which both parents work. (Pl.'s Resp. Br., at pp. 4–5). This religious school would constitute an outreach mission to bring young people and families into Christianity. (*Id.* at p. 5). Further, it would violate Plaintiff's religious doctrine for it to limit the "religious school" enrollment to Methodists or limit the instruction to strictly Methodist matters. (*Id.*). Plaintiff claims that Cheyenne's land use regulation limits and restricts its use and development of the land, including a structure affixed to the land. (*Id.*). Plaintiff also contests the Board's conclusion that the "religious school" would cause any serious traffic or safety problems in the residential neighborhood. (*Id.* at 5–6).

Nevertheless, Reverend Laughlin testified that the Church did not plan to operate a primary or secondary school; specifically, he testified that the church was "not a primary or secondary school because we weren't teaching those levels of classes, like you would a first or second grade. Those kids are in school, public or private schools." (Pl.'s Suppl. Br., Exh. A, at p. 10). Further, Reverend Laughlin testified that: (1) he never approached the Wyoming Department of Education about the Church's proposed "religious school"; (2) he would not require employees to have teaching certificates; (3) he would require its employees to be given training pursuant to the Wyoming Department of Family Service's regulations for day care centers; (4) he would train its employees on religious instruction; and (5) the fees charged for the "religious school" would be commensurate with those charged by day care facilities in Cheyenne, and the church would not charge tuition similar to what religious schools charge. (*Id.* at Exh. A).

### *Legal Standard*

Summary judgment is proper when there is no genuine issue of material fact to be resolved at trial. Fed.R.Civ.P. 56(c); *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993). Thus, a district court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Nelson v. Geringer,* 295 F.3d 1082, 1086 (10th Cir.2002). "An issue of material fact is genuine where a reasonable jury could return a verdict for the party opposing summary judgment." *Seymore v. Shawver & Sons, Inc.,* 111 F.3d 794, 797 (10th Cir.1997).

In applying these standards, the district court will view the evidence in the light most favorable to the party opposing summary judgment. *Jenkins v. Wood,* 81 F.3d

988, 990 (10th Cir.1996). The movant bears the initial burden of demonstrating the absence of evidence to support the non-moving party's claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the non-moving party bears the burden of proof at trial, the burden then shifts to it to demonstrate the existence of an essential element of its case. *Id.* To carry this burden, the non-moving party must go beyond the pleadings and designate specific facts to show there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ford v. West,* 222 F.3d 767, 774 (10th Cir.2000). The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient to create a "genuine" issue of disputed fact. *Lawmaster v. Ward,* 125 F.3d 1341, 1347 (10th Cir.1997).

### Analysis

I. Plaintiff's Cross–Motion for Partial Summary Judgment on its First Claim for Relief under the Religious Land Use and Institutionalized Persons Act and Defendants' Motion for Summary Judgment on Plaintiff's First Claim for Relief.

Both Plaintiff and Defendants have filed motions for summary judgment on the RLUIPA claim; therefore, any disputed material facts will be noted since it "should be remembered a party moving for summary judgment concedes the absence of a factual issue and the truth of the nonmoving party's allegations only for purposes of his own motion." 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3d § 2720, at 332 (1998).

Plaintiff argues that it is entitled to summary judgment on its First Claim for Relief under RLUIPA because Cheyenne's zoning regulations, and the Board of Ad-

justment's decision not to grant it a variance to operate the day care/religious school, impose a substantial burden on Grace United's exercise of religion. (Pl.'s Suppl. Br., at pp. 8–15). Therefore, Plaintiff argues that because indoctrination of children is a sincerely held belief and Defendants cannot demonstrate that the zoning regulations further a compelling governmental interest by the least restrictive means, Plaintiff is entitled to summary judgment. (*Id.* at pp. 15–16).

Defendants argue they are entitled to summary judgment on Plaintiff's RLUIPA claim because: (1) RLUIPA's legislative history evidences a congressional intent that a commercial day care facility should not be exempt from a non-discriminatory zoning ordinance; and (2) Reverend Laughlin's deposition is evidence that the proposed day care operation is not a sincere "religious exercise" under RLUIPA. (City Defs.' Supplemental Br. ("Defs.' Suppl. Br."), at pp. 7–13).

A. The Religious Land Use and Institutionalized Persons Act ("RLUIPA") of 2000.

In 2000, Congress passed the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc to 2000cc–5, in response to the Supreme Court's decision in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), which held RLUIPA's predecessor, the Religious Freedom Restoration Act ("RFRA"), unconstitutional. There are relatively few reported decisions on RLUIPA's land use regulation provision (as opposed to its institutionalized persons provisions) because of its recent enactment. As a result, the Court will address RLUIPA's statutory scheme, legislative history, and the case law interpreting the Act.

Neither the Tenth Circuit, nor any other Circuit Court of Appeals, has addressed

the constitutionality of RLUIPA's land use provisions. The District of Columbia Circuit denied a petition for rehearing under RLUIPA without addressing its constitutionality. *Henderson v. Kennedy,* 265 F.3d 1072 (D.C.Cir.2001). However, one federal district court has specifically held RLUIPA to be constitutional. *Freedom Baptist Church of Del. County v. Township of Middletown,* 204 F.Supp.2d 857 (E.D.Pa.2002); *see also, Cottonwood Christian Center v. Cypress Redevelopment Agency,* 218 F.Supp.2d 1203, 1221 n. 7 (C.D.Cal.2002) (noting that RLUIPA appeared to avoid the constitutional flaws of its · predecessor, RFRA). Defendants in this case do not appear to challenge the constitutionality of RLUIPA; · therefore, the Court will presume the Act is constitutional. *Bowen v. Kendrick,* 487 U.S. 589, 617, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988).

### 1. RLUIPA's Statutory Scheme.

Generally, RLUIPA provides a broad "general rule" for "protection of land use as a religious exercise" and then limits the application of that general rule to three instances where Congress has the purported power to regulate such activity pursuant to the Spending Clause, Commerce Clause, and the Enforcement Clause of the Fourteenth Amendment. Specifically, RLUIPA's general rule provides:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).

Notwithstanding the breadth of this general rule, the statute then limits its applicability to cases in which:

> (A) the substantial burden is imposed in a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability;[1]
>
> (B) the substantial burden affects ... [interstate] commerce, even if the burden results from a rule of general applicability;[2] or
>
> (C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which the government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of proposed uses for the property involved.[3]

42 U.S.C. § 2000cc(a)(2)(A)-(C).

RLUIPA provides that a person may assert a violation of the Act in a judicial proceeding to obtain relief against the government. 42 U.S.C. § 2000cc–2(a). In

---

**1.** This jurisdictional basis for RLUIPA is the Spending Clause. U.S. Const. art. I, § 8, cl. 1. One federal district court has held this provision of the RLUIPA to be a valid exercise of Congress' power under the Spending Clause. *Charles v. Verhagen,* 220 F.Supp.2d 955, 966 (W.D.Wis.2002).

**2.** This jurisdictional basis for RLUIPA is the Commerce Clause. U.S. Const. art. I, § 8, cl. 3. The Tenth Circuit has stated that churches and the religious exercises they car-

ry out have a significant impact on interstate commerce. *United States v. Grassie,* 237 F.3d 1199, 1209 (10th Cir.2001).

**3.** This jurisdictional basis for RLUIPA is the Enforcement Clause of the Fourteenth Amendment. U.S. Const. amend. XIV, § 5. This section of RLUIPA attempts to codify the individualized assessments analysis from Free Exercise Clause jurisprudence. *See Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

such a suit, the plaintiff has the initial burden of proving that the government regulation imposes a "substantial burden" on the exercise of religion. 42 U.S.C. § 2000cc–2(b). If the plaintiff carries its burden, the burden then shifts to the government to prove all other elements of the claim (i.e., that the government regulation is in furtherance of a compelling governmental interest and the least restrictive means of furthering that interest). *Id.*

RLUIPA does not define what constitutes a "substantial burden" on the exercise of religion. However, RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). Further, the Act provides that the "use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. § 2000cc–5(7)(B).

### 2. RLUIPA's Legislative History.

RLUIPA was enacted in response to the Supreme Court's decision in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), which held the RFRA unconstitutional. 146 Cong. Rec. E. 1234, 1235 (July 14, 2000). The purpose of Act was to "remedy the well documented discriminatory and abusive treatment suffered by religious individuals and organizations in the land use context." *Id.* at 1235. According to Congress, the Act achieves this end by imposing a strict scrutiny standard of review on the government if a claimant demonstrates that the government substantially burdened his or her free exercise of religion. 146 Cong. Rec. S. 7774 (July 27, 2000).

In the land use context, Congress made several findings that are pertinent to resolution of the matter currently before the Court. First, Senators Hatch and Kennedy, co-sponsors of the Act, stated:

> This Act does not provide religious institutions with immunity from land use regulation, nor does it relieve religious institutions from applying for variances, special permits or exceptions, hardship approval, or other relief provisions in land use regulations, where available without discrimination and unfair delay....
>
> In many cases, real property is used by religious institutions for purposes that are comparable to those carried out by other institutions. While recognizing these facilities may be owned, sponsored or operated by a religious institution, or may permit a religious institution to obtain additional funds to further its religious activities, this alone does not automatically bring these activities or facilities within the bill's definition or [sic] religious exercise.

146 Cong. Rec. S. 7774, 7776 (July 27, 2000).

Congress made clear that it "is only the use, building, or conversion for religious purposes that is protected, and not other uses or portions of the same property." 146 Cong. Rec. E 1563, 1564 (September 22, 2000). For example:

> [I]f a commercial enterprise builds a chapel in one wing of the building, the chapel is protected if the owner is sincere about its religious purposes, but the commercial enterprise is not protected. Similarly if religious services are conducted once a week in a building otherwise devoted to secular commerce, the religious services may be protected but the secular commerce is not.

*Id.*

### 3. RLUIPA Case Law and Analysis.

#### a. *Prima Facie* Case Under RLUIPA.

██ In order to establish a *prima facie* case that RLUIPA has been violated,

a plaintiff must present evidence that the land use regulation in question: (1) imposes a substantial burden; (2) on the "religious exercise;" (3) of a person, institution, or assembly. 42 U.S.C. § 2000cc(a)(1); *Murphy v. Zoning Comm'n of the Town of New Milford,* 148 F.Supp.2d 173, 187 (D.Conn.2001). If the plaintiff makes this prima facie showing, the burden shifts to the local government to demonstrate that the land use regulation furthers a compelling governmental interest and that the land use regulation is the least restrictive means of furthering that compelling interest. 42 U.S.C. § 2000cc(a)(1)(A)-(B).

 i. Substantial Burden Test.

RLUIPA does not define what constitutes a "substantial burden" on religious exercise; however, the Act's legislative history evidences Congress' intent that courts apply the same "substantial burden" test that was applied under RFRA. 146 Cong. Rec. E. 1563 (Sept. 22, 2000) (noting RLUIPA's "general rule" tracks the substantive language of RFRA but limits its scope to land use laws). The substantial burden must be on a "sincerely held" religious belief. *Werner v. McCotter,* 49 F.3d 1476, 1479 n. 1 (10th Cir.1995) (citing *Wisconsin v. Yoder,* 406 U.S. 205, 215–19, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)).

██ The Supreme Court has articulated the substantial burden test differently over the years. *See Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 450–51, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988); *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In *Lyng,* the Supreme Court stated that for a governmental regulation to substantially burden religious activity, it must have a tendency to coerce individuals into acting contrary to their religious beliefs. 485 U.S. at 450–51, 108 S.Ct. 1319; *see also Thomas,* 450 U.S. at 717–18, 101 S.Ct. 1425 (holding that a substantial burden exists where the government puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs ...."). Conversely, a government regulation does not substantially burden religious activity when it only has an incidental effect that makes it more difficult to practice the religion. *Id.; Thiry v. Carlson,* 78 F.3d 1491, 1495 (10th Cir.1996). Thus, for a burden on religion to be substantial, the government regulation must compel action or inaction with respect to the sincerely held belief; mere inconvenience to the religious institution or adherent is insufficient. *Werner,* 49 F.3d at 1480; *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996).

District court cases interpreting RLUIPA since its enactment delineate the difference between a "substantial burden" on religious exercise as opposed to an "inconvenience" on religious exercise. Consistent with the Supreme Court's substantial burden test, district courts have concluded that the regulations must have a "chilling effect" on the exercise of religion to substantially burden religious exercise. *Murphy,* 148 F.Supp.2d at 188–89. In *Murphy,* the District Court for the District of Connecticut held that a city's zoning regulation and the zoning commission's issuance of a cease and desist order to prohibit the plaintiffs from having a Sunday prayer group at their house imposed a substantial burden on plaintiffs' exercise of religion. *Id.* The district court explained that the issuance of the cease and desist order, which dissuaded parishioners from attending the Sunday prayer group for fear of arrest, was a substantial burden of the plaintiffs' exercise of religion because:

 Foregoing or modifying the practice of one's religion because of governmental interference or fear of punishment by

the government is precisely the type of "substantial burden" Congress intended to trigger the RLUIPA's protections . . . .

*Id.*

Likewise, in *Cottonwood Christian Center v. Cypress Redevelopment Agency,* a federal district court held that the denial of an application to build a church on its property constituted a substantial burden because "[p]reventing a church from building a worship site fundamentally inhibits its ability to practice its religion." 218 F.Supp.2d 1203, 1226–27 (C.D.Cal.2002).

On the other hand, federal courts have been reluctant to find a substantial burden on religion where the land use regulation merely creates an inconvenience, economic or otherwise, on the institution or adherent. *See Henderson v. Kennedy,* 265 F.3d 1072, 1074 (D.C.Cir.2001). In *Henderson,* the District of Columbia Circuit held that a park service regulation which prohibited the plaintiffs from selling T-shirts on the National Mall was not a substantial burden on the plaintiffs' religious exercise because the ban on T–Shirt sales was, at most, only a restriction on one of a multitude of means by which the plaintiffs could engage in their vocation to spread the gospel. *Id.* The Circuit Court of Appeals explained that the plaintiffs could operate their business, i.e. selling T-shirts, in other areas of the town consistent with the land use regulations; therefore, the regulation was not a substantial burden on their vocation. *Id.*

Similarly, the Northern District of California held that a religious institution that was denied a zoning application to use property as a Christian college campus could not demonstrate a substantial burden on its religion because having the college in that particular area of the city was not a religious experience mandated by the plaintiff's faith. *San Jose Christian College v. City of Morgan Hill,* No. CO1–20857–RMW, 2002 WL 971779, 2002 U.S.

Dist. LEXIS 4517 (N.D.Cal. March 5, 2002). Additionally, in a pre-RFRA and RLUIPA case, the Second Circuit held that a religious institution had failed to demonstrate a substantial burden on its religious activities when it was denied a variance to expand its church building for purely commercial reasons in order to generate revenues for the church. *Rector, Wardens, and Members of Vestry of St. Bartholomew's Church v. City of New York,* 914 F.2d 348, 357 (2d Cir.1990). There, the Second Circuit agreed with the district court's holding that the religious institution could carry out its religious mission in existing facilities. *Id.*

■ Additionally, under RLUIPA, the substantial burden imposed by the local government must be on a "sincere" exercise of religion. *Kikumura v. Hurley,* 242 F.3d 950, 960 (10th Cir.2001); *Marria v. Broaddus,* 200 F.Supp.2d 280, 292 (S.D.N.Y.2002). "Whether religious beliefs are sincerely held is a question of fact." *Mosier v. Maynard,* 937 F.2d 1521, 1526 (10th Cir.1991). A religious belief is sincere if it is truly held and religious in nature. *Id.; United States v. Meyers,* 95 F.3d 1475, 1484 (10th Cir.1996). A mere allegation of sincere religious belief is insufficient to preclude summary judgment. *Mosier,* 937 F.2d at 1527.

ii. Exercise of Religion.

The second requirement a claimant must demonstrate in order to state a claim under RLUIPA is that the land use regulation substantially burdens the person or institution's "religious exercise." *See Kikumura v. Hurley,* 242 F.3d 950, 960–61 (10th Cir.2001). Religious activity is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). Additionally, the "use, building, or conversion of real property for

the purpose of religious exercise" is considered to be in itself a "religious exercise." 42 U.S.C. § 2000cc–5(7)(B).

Under this definition, courts have concluded the following activities constitute "religious exercises" for purposes of RLUIPA: (1) pastoral visits by Christian pastors to institutionalized persons, *Kikumura*, 242 F.3d at 961; (2) seeking to build a church, *Cottonwood Christian Center*, 218 F.Supp.2d at 1224; and (3) prayer groups at a private residence, *Murphy*, 148 F.Supp.2d at 188–89; *Dilaura v. Ann Arbor Charter Township*, 30 Fed. Appx. 501, 509 (6th Cir.2002) (unpublished).

### b. Compelling Governmental Interest/Least Restrictive Means.

If the plaintiff establishes a *prima facie* case under RLUIPA, the burden shifts to the local government to prove its land use regulation furthers a compelling governmental interest by the least restrictive means. Thus, RLUIPA imposes a "strict scrutiny" standard of review on land use laws that substantially burden religious exercise. Therefore, even if the local government demonstrates a compelling state interest, the land use regulation must be the least restrictive means to further that interest; that is, the local government must show there are no other alternative forms of regulation that would further the governmental interest. *Sherbert v. Verner*, 374 U.S. 398, 407, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

In *Murphy*, the district court for the District of Connecticut found that local governments have a compelling interest in enforcing the town's zoning regulations and ensuring the safety of residential neighborhoods through traffic regulations. 148 F.Supp.2d at 190. However, the district court concluded that a regulation which prohibited the plaintiff from having Sunday prayer meetings at her house was not the least restrictive means of further-

ing that governmental interest. *Id.; see also Dilaura*, 30 Fed. Appx. at 509 (finding the local government failed to demonstrate that its land use regulations were the least restrictive means of furthering the compelling governmental interest of traffic control and protecting aesthetics). The Central District of California has held that "blight" and "revenue generation" are not compelling interests under RLUIPA. *Cottonwood Christian Center*, 218 F.Supp.2d at 1227–28. It is not surprising that local governments have never succeeded in carrying their burden under RLUIPA, because requiring the government "to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

### B. Application.

 The RLUIPA itself, its legislative history, and the case law interpreting it, compel this Court to conclude that summary judgment on Plaintiff's RLUIPA claim would be inappropriate because Grace United has not carried its burden of demonstrating that Cheyenne's land use regulations impose a substantial burden on its exercise of religion. To be entitled to summary judgment on its RLUIPA claim, Grace United has the burden of demonstrating that the Cheyenne's LR–1 zoning regulations: (1) imposed a substantial burden (2) on Grace United's (3) religious exercise. 42 U.S.C. § 2000cc–2(b). Grace United is an institution or assembly under RLUIPA; however, genuine issues of material fact exist as to whether the proposed day care facility with a religious component is "religious exercise" under RLUIPA; and if so, whether that religious exercise is substantially burdened.

First, a genuine issue of material fact exists as to whether operating a day care with a religious component constitutes religious exercise under RLUIPA. The Act's legislative history makes quite clear that a religious institution is not exempt from a local government's land use regulations by simply labeling its commercial endeavor "religious exercise." In fact, this case seems to fall squarely within some of the examples provided by Congress in explaining that religious institutions are not provided immunity from land use regulations. See 146 Cong. Rec. S. at 7776; 146 Cong. Rec. E. at 1564.

Viewing the evidence in the light most favorable to Defendants, a genuine issue of material fact exists as to whether Reverend Laughlin ever intended the day care to be a "religious school." A reasonable jury could conclude from Reverend Laughlin's activities prior to the commencement of this action that the purpose behind the day care facility was "commercial." For example, the "religious school's" proposed hours of operation were from 6:00 a.m. to 12:00 a.m. in order to accommodate local businesses in the area. Plaintiff maintains that children, even newborns, can be indoctrinated by listening to religious songs and being read religious books. However, even assuming such a statement were true, a reasonable juror would be hard pressed to posit that a newborn child is receiving religious education at 11:30 p.m.

Moreover, Reverend Laughlin made numerous representations that he was planning on operating a "day care" facility prior to this litigation. Defendants have submitted affidavits of individuals who assisted or were involved with Reverend Laughlin in seeking licensing for the day care facility, and he never once indicated that it would have any type of religious component. (Defs.' Resp. to Pl.'s Mot. for Summ. J., at Exh. A, pp. 2–3; Exh. B, at pp. 2–3). This evidence is, however, in conflict with Grace United's representations at the Board of Adjustment hearing and with a letter by Reverend Laughlin dated January 10, 2001, where he referred to the facility as a "church-sponsored day-care." (Pl.'s Resp. Br., at Exh. C; Pl.'s Mot. Complying with Order Requesting Additional Information, Exh. 1).

Second, summary judgment is inappropriate because a genuine issue of material fact exists as to whether Cheyenne's land use regulations substantially burdened Grace United's exercise of religion. For a government regulation to substantially burden religious activity, it must have the tendency to coerce individuals into acting contrary to their religious beliefs. Here, Plaintiff is inconvenienced by Cheyenne's land use regulations; however, Cheyenne is not putting substantial pressure on Grace United to modify its behavior or violate its religious beliefs. Rather, it is simply requiring that Grace United operate its "major child care center," see Cheyenne Code, Appendix A–Zoning, § 20.000(34)(d), in an area of the City zoned for such an operation. This does not have a significant "chilling effect" on Grace United's exercise of religion, like being placed in fear of arrest for the exercise of religion or not being able to construct a church. Rather, it is more akin to the situation encountered by the District of Columbia Circuit in Henderson v. Kennedy, 265 F.3d 1072 (D.C.Cir.2001). As was the case in Kennedy, Grace United could operate its day care facility in other areas of the City consistent with Cheyenne's land use regulations. These regulations, at most, only place one restriction on a multitude of means by which Grace United could engage in its religious vocation to indoctrinate children into its faith. See Kennedy, 265 F.3d at 1074; St. Bartholomew's Church, 914 F.2d at 357.

Third, a genuine issue of material fact exists as to whether the operation of the

day care is a "sincere" exercise of Grace United's religion. In the Tenth Circuit, whether religious exercise is sincere is a question of fact. In this case, Defendants have pointed to evidence which indicates that: (1) Grace United's proposed day care may not be religious in nature; and (2) even if it is a "religious school," as Plaintiff now contends, Reverend Laughlin labeled it as such for legal protection. A reasonable jury could conclude either way on the evidence presented in the motions for summary judgment.

### C. Conclusion.

Genuine issues of material fact exist on all the elements of the Plaintiff's *prima facie* case under RLUIPA. Therefore, Plaintiff's Cross–Motion for Partial Summary Judgment on its First Claim for Relief and Defendants' Motion for Summary Judgment on Plaintiff's First Claim for Relief are **DENIED**.

### II. Defendants' Motion for Summary Judgment on Plaintiff's Second Claim for Relief under 42 U.S.C. § 1983 and the First Amendment.

Plaintiff's Second Claim for Relief, brought pursuant to 42 U.S.C. § 1983, alleges that Defendants acting under the color of state law deprived Grace United of its constitutional rights to the free exercise of religion, freedom of speech, and freedom of association in violation of the First Amendment. (Pl.'s Comp. ¶¶ 23–25).

### A. Free Exercise of Religion.

Defendants argue they are entitled to summary judgment on Plaintiff's First Amendment Free Exercise of Religion

claim because Cheyenne's land use regulations are neutral, generally applicable, and do not substantially burden Grace United's exercise of religion. (Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mot. to Dismiss"), at pp. 5–10). Plaintiff responds that even if the land use regulations in this case can be considered neutral and generally applicable, the "hybrid-rights" exception articulated by the Supreme Court applies, and that its religious activity is substantially burdened because Defendants' land use regulations curtail its ability to propagate its religious message through the operation of its religious education program.[4] (Pl.'s Resp. Br., at pp. 4–7). Plaintiff also asserts that its constitutional rights to free speech and association have been violated because it cannot gather together with children to teach the church's message. (*Id.* at 20).

The Court undertakes its analysis of Plaintiff's constitutional claims cognizant that one of the purposes of the Bill of Rights was to withdraw certain subjects, such as one's right to free speech and freedom of religion, from the vicissitudes of political controversy and establish them as legal principles to be uniformly applied by the courts. *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

### 1. Free Exercise of Religion Standards.

There are three clauses in the United States Constitution that deal with religious freedom; however, Plaintiff is only concerned with the First Amendment's guarantee that Congress shall make no law prohibiting the free exercise of religion.[5]

---

4. Viewing the facts in the light most favorable to Plaintiff, the non-moving party on the constitutional claims, the Court will assume the proposed use of Grace United's addition to the church was a religious education program. However, the Court will refrain from

calling it a religious "school" because Plaintiff does not intend to operate a primary or secondary school as those terms are defined in the Cheyenne Zoning Code.

5. The other two clauses in the Constitution dealing with religious freedom are the Estab-

U.S. Const. amend. I. The Free Exercise Clause applies to the states and local governments through the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

■ The Free Exercise Clause provides absolute protection to religious beliefs and opinions. *Braunfeld v. Brown,* 366 U.S. 599, 603, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). However, Congress and local governments may validly regulate religious conduct. *Reynolds v. United States,* 98 U.S. 145, 164, 8 Otto 145, 25 L.Ed. 244 (1878) (noting that the Free Exercise Clause deprived Congress "of legislative power over mere opinion, but was left free to reach actions."); *Cantwell,* 310 U.S. at 303–304, 60 S.Ct. 900; *Messiah Baptist Church v. County of Jefferson,* 859 F.2d 820, 824 (10th Cir.1988). The Free Exercise Clause "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Employment Div., Dep't of Human Resources of Ore. v. Smith,* 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (quoting *United States v. Lee,* 455 U.S. 252, 263 n. 3, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982)). The Supreme Court's Free Exercise cases firmly

> establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.... A law failing to satisfy these requirements

[i.e., is not neutral or generally applicable] must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (citing *Smith,* 494 U.S. 872, 110 S.Ct. 1595).

Thus, the threshold question in free exercise cases is whether the law that allegedly prohibits the free exercise of religion is neutral and of general applicability. *First Assembly of God of Naples, Fla., Inc. v. Collier County,* 20 F.3d 419, 423 (11th Cir.1994). A law is neutral if its object is something other than the infringement or restriction of religious practices. *City of Hialeah,* 508 U.S. at 533, 113 S.Ct. 2217. In other words, a "law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context." *Id.* In *City of Hialeah,* the majority of the Court did not "define with precision" the generally applicable standard but indicated that a law is generally applicable if it does not impose burdens on conduct motivated only by religious belief. *Id.* at 543, 113 S.Ct. 2217. In his concurring opinion, Justice Scalia explained these standards:

> [T]he defect of lack of neutrality applies primarily to those laws that *by their terms* impose disabilities on the basis of religion (*e.g.,* a law excluding members of a certain sect from public benefits ...); whereas, the defect of lack of general applicability applies primarily to those laws which, though neutral in their terms, through their design, construction, or enforcement target the practices

lishment Clause in the First Amendment and Article VI's prohibition on requiring a religious test as a qualification for holding public office. *See* U.S. Const. amend. I; U.S. Const. art. VI. Although the Establishment Clause is not implicated in this case, it should be noted that the Supreme Court, in an Estab-

lishment Clause case, stated that religious activity may be subject to religiously neutral laws restricting property use, such as zoning regulations. *See Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

of a particular religion for discriminatory treatment . . . .

*Id.* at 557, 113 S.Ct. 2217 (Scalia, J., concurring) (internal citations omitted). In sum, if the law is neutral and generally applicable, then it need only be rationally related to a legitimate government end to be constitutional. *United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir.2002).

Several federal courts have held that land use regulations, i.e. zoning ordinances, are neutral and generally applicable notwithstanding that they may have individualized procedures for obtaining special use permits or variances. *See Collier County*, 20 F.3d at 423; *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 472 (8th Cir.1991); *Mount Elliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 405 (6th Cir.1999); *Rector of St. Bartholomew's Church v. City of New York*, 914 F.2d 348, 354 (2d Cir.1990); *C.L.U.B. v. City of Chicago*, 157 F.Supp.2d 903, 914–15 (N.D.Ill.2001). These courts have reasoned that although zoning laws generally require individualized assessment for special use permits or variances, they are motivated by secular purposes and impact all land owners within the city that seek a variance or special use permit equally. *See e.g., Collier County*, 20 F.3d at 423–24; *City of Troy*, 171 F.3d at 405; *City of Chicago*, 157 F.Supp.2d at 914–15.

Although the Tenth Circuit has not addressed this specific issue subsequent to the Supreme Court's decisions in *Smith* and *City of Hialeah*, this Court believes it would follow the approach taken by the Eleventh, Eighth, Sixth, and Second Circuits. *See Swanson v. Guthrie Indep. Sch. Dist.*, 135 F.3d 694, 701 (10th Cir.1998) (finding that the Free Exercise Clause offers no protection when a regulation contains broad objectively defined exceptions not entailing subjective individualized considerations). In *Messiah Baptist Church v. County of Jefferson*, the Tenth Circuit considered a free exercise challenge by a church to a county's denial of a special use permit which would have allowed it to build a church in an agricultural ("A–2") zoned area of the county. 859 F.2d 820, 821–23 (10th Cir.1988). In holding the county's denial of the special use permit did not violate the Free Exercise Clause, the Tenth Circuit concluded that the construction of the church in an A–2 zoned area was not integrally related to the underlying religious beliefs of the Church. *Id.* at 824. The Tenth Circuit found it important that there was no evidence that "building a church or building a church on *the particular site* [was] intimately related to the religious tenets of the church." *Id.* at 825 (emphasis added). That the county's zoning regulations had the incidental effect of making the practice of religion more expensive for the church because it had to build elsewhere in the county was inconsequential. *Id.* The court concluded by unequivocally stating that "a church has no constitutional right to be free from reasonable zoning regulations nor does a church have a constitutional right to build its house of worship where it pleases." *Id.* at 826.

2. Application.

██ Grace United is located in a Low-Density Residential Established (LR–1) neighborhood in Cheyenne. As defined by the Cheyenne Code, Grace United intends to operate a "Child care center-major (CCC-major)" to educate youth in the community about the Christian faith. (*See* Cheyenne Code, Appendix A-zoning, § 20.000(34)(d)). Thus, Grace United's proposed use of its addition is more than just a "religious belief or opinion;" it is religious conduct. Consequently, the City of Cheyenne may validly regulate such conduct.

Cheyenne's zoning ordinance, however, simply does not permit anyone, religious

institutions or otherwise, to operate a CCC-major in a LR–1 zoned area. (*See id.* at §§ 41.100, 41.110 to 41.113). In fact, in denying Grace United's application for a variance, the Board of Adjustment specifically concluded that it had "no authority or discretion" to grant Grace United a variance for its proposed religious education program, which would enroll up to one-hundred kids for eighteen hours a day, seven days a week. (Pl.'s Resp. Br., Exh. B, at p. 3, ¶ 5).

The object of Cheyenne's zoning ordinance is, among others, to: (1) promote the health, safety, and general welfare of the citizens of Cheyenne and Laramie County; (2) create an attractive living and working environment; (3) lessen congestion in the streets; (4) prevent the overcrowding of land; and (5) facilitate provisions for transportation, water, sewage, schools, parks, and other public requirements. (*See* Cheyenne Code, Appendix A–Zoning, § 10.000). Grace United has not submitted any evidence that the LR–1 zoning regulations were enacted with the purpose of suppressing the celebration of religion in Cheyenne; therefore, this case is distinguishable from the Supreme Court's decision in *City of Hialeah,* 508 U.S. 520, 113 S.Ct. 2217.

The LR–1 zoning regulations are facially neutral because they do not, by their terms, impose disabilities on the basis of religion. Additionally, there has been no evidence presented that the Board of Adjustment applied the zoning ordinance in a selective or discriminatory manner, which would offend the neutrality requirement. *See City of Hialeah,* 508 U.S. at 537, 113 S.Ct. 2217. In fact, the Board of Adjustment specifically concluded it was without discretion to grant such a variance; hence, it cannot be argued that any subjective individualized considerations were at play in this case. *See Swanson,* 135 F.3d at 701. Moreover, the LR–1 zoning regula-

tions are generally applicable because they do not impose "burdens" on conduct motivated by religious belief; that is, the LR–1 zoning regulations do not target the practices of the Methodist religion for discriminatory treatment. As a result, because the LR–1 Zoning regulations are neutral and generally applicable, Cheyenne does not have to demonstrate that the regulations serve a compelling governmental interest.

Grace United's Free Exercise claim fails because, viewing the facts in the light most favorable to it, all the evidence demonstrates is, at most, an incidental burden on its religious conduct. As was the case in *Messiah Baptist Church v. County of Jefferson,* 859 F.2d 820 (10th Cir.1988), there is no evidence that operating the religious education program in the LR–1 zoned area, i.e. "that particular site," is integrally related to Grace United's underlying religious belief. Grace United could operate its religious education program in another area of Cheyenne that is properly zoned for such an operation. Or, Grace United could operate its religious education program in its present building, where it has Sunday school facilities, but not upon such a grandiose scale as the day care center it now wishes to construct. If from its present Sunday school of twelve to twenty there had been such great growth and expansion that it was necessary to expand the school to one hundred, then one might not doubt the bona fides of Grace United's church; but, in the absence of the demonstrated need for a larger church school then the existing one, the Court must suppose that Reverend Laughlin and his flocks have been enticed into the world of crass commercialization.

Consequently, to grant Grace United a special variance to operate its religious education program in an LR–1 zoned area would be to give Grace United (and theoretically all religious organizations) special

treatment by Cheyenne solely on the basis of its "religious beliefs" concerning the religious education of children. However, "[n]othing in the Free Exercise Clause requires that special treatment be provided." *Swanson v. Guthrie Indep. Sch. Dist.*, 135 F.3d 694, 702 (10th Cir.1998). In fact, granting such a special variance may run afoul of the Establishment Clause. *See id.* at 702 n. 7.

Surely, Cheyenne's zoning regulations have the incidental effect of making Grace United's practice of religion more expensive and inconvenient. However, as the Tenth Circuit explained in *Messiah Baptist Church*, the Free Exercise Clause does not provide Grace United a remedy for these incidental effects imposed upon it by Cheyenne's reasonable zoning ordinance. 859 F.2d at 824–26. This is not to say that Grace United is without a remedy, as the Supreme Court explained in *Smith*, Grace United's proper avenue of redress is the political process, and this "unavoidable consequence of democratic government must be preferred to a system in which each conscience is a law unto itself or in which judges weigh the social importance of all laws against the centrality of all religious beliefs." 494 U.S. at 890, 110 S.Ct. 1595.

3. The "Hybrid–Rights" Exception to Neutral and Generally Applicable Regulation of Religious Conduct.

Plaintiff asserts that its claim is not governed by the "generally applicable" rule enunciated by the Supreme Court in *Smith* because its claim is a "hybrid" of both free exercise rights and other constitutionally protected rights. (Pl.'s Resp. Br. at pp. 10–11). In *Smith*, the Supreme Court noted that the only decisions in which it has held that the "First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press ...." *Smith*, 494 U.S. at 881, 110 S.Ct. 1595.[6]

In *Swanson*, the Tenth Circuit explained that "it is difficult to delineate the exact contours of the hybrid-rights theory discussed in *Smith*." 135 F.3d at 699. However, the Tenth Circuit explained that at the very least, the hybrid-rights exception requires a "colorable showing of infringement of recognized and specific constitutional rights, rather than a mere invocation of a general right ...." *Id.* at 700. Thus, if the other constitutional claims cannot stand independently of the free exercise claim, there is no basis for applying the hybrid-rights exception. *Thiry v. Carlson*, 78 F.3d 1491, 1496 (10th Cir.1996). The Tenth Circuit has not been confronted with a hybrid-rights claim in which a plaintiff alleges a deprivation of freedom of speech and association. However, the Third Circuit has held that while there is a constitutionally secured right to associate for reli-

6. The constitutional validity and extent of the hybrid-rights exception is debatable. The Sixth Circuit has rejected the assertion that a hybrid-rights claim is subject to strict scrutiny. *Prater v. City of Burnside*, 289 F.3d 417, 430 (6th Cir.2002). The Supreme Court has recognized the Sixth Circuit's view with respect to hybrid-rights claims but has not addressed the Sixth Circuit's contention that the hybrid-rights exception is not binding, because the language was dicta. *See Watchtow-* *er Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 122 S.Ct. 2080, 2085–86 & n. 8, 153 L.Ed.2d 205 (2002). Justice Souter also questioned the validity of the hybrid-rights exception in *City of Hialeah*, when he noted that such an exception would swallow the rule and eviscerate the need for free exercise analysis at all. 508 U.S. at 567, 113 S.Ct. 2217 (Souter, J., concurring).

gious purposes, the religious motivation of those who associate for religious purposes does not entitle them to an exemption from *Smith*'s. generally applicable rule because that associational right is derivative of the right to the free exercise of religion. *Salvation Army v. Dep't of Community Affairs of N.J.*, 919 F.2d 183, 198–200 (3d Cir.1990) (citing *NAACP v. Alabama*, 357 U.S. 449, 460–61, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)).

### 4. Application.

In this case, Plaintiff has alleged numerous constitutional claims, in addition to its free exercise claim, in its attempt to fall within the hybrid-rights exception. However, as discussed more fully below, Plaintiff has not alleged a colorable claim of a violation of its First Amendment rights to free speech or association or its Fourteenth Amendment rights to due process or equal protection. Therefore, Grace United's case does not fall within the hybrid-rights exception. Thus, because the Court concludes Plaintiff's other constitutional claims cannot stand independent of its free exercise claim, there is no basis for applying the purported hybrid-rights exception to the general applicability rule announced in *Smith*.

### B. Freedom of Speech and Freedom of Association.

■ Defendants argue that the they could not have deprived Grace United of its constitutional right to free speech and association because the object of the City's land use regulations is unrelated to expression and there is a dearth of evidence that the zoning regulations have affected the ability of the church members to assemble and associate with one another. (Defs.' Mot. to Dismiss, at p. 9). Plaintiff responds that its "speech, assembly, and associational rights are obviously violated here, where they are prohibited from gathering together with children to teach the

Church's message." (Pl.'s Resp. Br., at p. 20).

In relevant part, the First Amendment provides that "Congress shall make no law ... abridging the freedom of speech, ... or the right of the people to peaceably assemble." U.S. Const. amend. I. The First Amendment's Free Speech Clause and Freedom of Association Clauses apply to the states through the Fourteenth Amendment. *See Gitlow v. People of New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925) (free speech); *De Jonge v. Oregon*, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937) (freedom of association).

With respect to the Free Speech Clause, a content-neutral regulation that incidentally burdens speech, including symbolic speech, is subject to intermediate scrutiny. *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). A "municipality's right to use its zoning power in the public interest is perhaps the paradigm of such a [content-neutral] restriction." *Gascoe, Ltd. v. Newtown Township*, 699 F.Supp. 1092, 1095 (E.D.Pa. 1988); *see also C.L.U.B. v. City of Chicago*, 157 F.Supp.2d 903, 915 (N.D.Ill.2001); *Roulette v. City of Seattle*, 850 F.Supp. 1442, 1448–49 (W.D.Wash.1994). Under the intermediate scrutiny standard of review, a "content-neutral regulation will be sustained if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner v. F.C.C.*, 520 U.S. 180, 189, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997). A municipality has an important or substantial governmental interest in enacting zoning regulations. As explained by Justice Powell:

> [It] is undeniable that zoning, when used to preserve the character of specific areas of the city, is perhaps the most essential function performed by local

government, for it is one of the primary means by which we protect that sometimes difficult to define concept of quality of life.

*Young v. Am. Mini Theatres, Inc.,* 427 U.S. 50, 80, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (Powell, J., concurring) (internal quotations and citations omitted).

With respect to the freedom of association, the Supreme Court has recognized that an individual's freedom to worship could not be vigorously protected from interference by the state unless a correlative right of freedom to engage in group effort towards those ends were not also guaranteed. *Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley,* 454 U.S. 290, 294, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981). Consequently, the Supreme Court has long understood that implicit in the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 907–909, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). The Supreme Court has afforded constitutional protection to freedom of association in two distinct senses:

First, the Court has held that the Constitution protects against unjustified interference with an individual's choice to enter into and maintain certain intimate or private relationships. Second, the Court has upheld freedom of individuals to associate for the purpose of engaging in protected speech or religious activities.

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 544, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). However, the "First Amendment protections as to speech and assembly are not so all-encompassing as to include all activity in which [a religious] idea, goal or value is promoted." *City of Chicago,* 157 F.Supp.2d at 915; *see*

*also Leathers v. Medlock,* 499 U.S. 439, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991) (upholding the application of a general sales tax to cable television that was not applicable to the print media because it did not suppress ideas).

The Court would obviously be concerned about Grace United's free speech and associational rights if Cheyenne enacted a zoning regulation that: (1) was content-based; (2) had a disparate impact on certain religious viewpoints; or (3) although facially neutral, was applied in a discriminatory manner. However, that is not this case.

In the present case, Cheyenne's LR–1 zoning regulations are content neutral; in fact, they do not even regulate any form of speech (i.e., the zoning ordinance is facially neutral). The zoning ordinance does not restrict, in any manner, Grace United's ability to communicate its religious message or associate with members of its congregation. Grace United is not excluded from any area of Cheyenne, it can gather and worship with members of its congregation as it has done since 1956, and it can gather together with children to teach the church's message. Indeed, it has maintained church school facilities in its present building for the religious instruction of children. That Grace United is required to comply with Cheyenne's zoning regulations in doing so does not violate its rights to free speech or freedom of association because the City has an important governmental interest in preserving the character of specific areas of Cheyenne, such as this quiet residential area. The LR–1 zoning regulations, and the zoning ordinance as a whole, is unrelated to the suppression of speech and does not burden more speech, if any, than necessary to further that interest. Therefore, the LR–1 zoning regulations survive intermediate scrutiny.

Additionally, the Court finds Defendants carried their burden of demonstrating the

absence of evidence to support Plaintiff's claim that its free speech and associational rights were violated. At this point, the burden shifted to Plaintiff to demonstrate an essential element of its case by designating specific facts to show there is a genuine issue for trial. This Plaintiff has not done. Rather, Plaintiff makes the conclusory allegation that its speech, assembly, and associational rights are "obviously" violated because it is prohibited from gathering with children to teach the church's message. Aside from the fact that unsupported propositions, arguments, and statements by counsel in a brief or memorandum in opposition to a motion for summary judgment are insufficient to create an issue of fact for purposes of summary judgment, there simply is no evidence that Grace United's constitutional rights to free speech or association were violated. *See Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.1992); *Hsu v. Wyo. Dep't of Transp.*, No. 93–8129, 1994 WL 721393, **2–3, 1994 U.S.App. LEXIS 36203, *6–7 (10th Cir. Dec. 22, 1994); *Fraser & Wise, P.C. v. Primarily Primates, Inc.*, 966 F.Supp. 63, 75 (D.Mass.1996).

### C. Conclusion.

For all the aforementioned reasons, Defendants' Motion for Summary Judgment on Plaintiff's Second Claim for Relief—violation of 42 U.S.C. § 1983 and the First Amendment—is **GRANTED.**

III. Defendants' Motion for Summary Judgment on Plaintiff's Third Claim for Relief under 42 U.S.C. § 1983 and the Fourteenth Amendment.

Plaintiff's Complaint alleges that Defendants denied it due process and equal protection of the laws in violation of the Fourteenth Amendment when Grace United was denied a variance to operate its religious education program from the church. (Pl.'s Comp. ¶¶ 26–30).

### A. Due Process Claim.

Defendants argue that they are entitled to summary judgment on Plaintiff's due process claim because Grace United has not alleged that it has a property interest subject to due process protections and has not explained how Cheyenne's zoning ordinance deprived it of a property interest protected by the Due Process Clause. (Defs.' Mot. to Dismiss, at pp. 13–14). Plaintiff responds that Cheyenne's zoning ordinance is arbitrary and unreasonable because there is no basis for the exclusion of religious uses from residential neighborhoods. (Pl.'s Resp. Br., at p. 22).

1. Due Process Standards in the Context of Zoning Regulations.

The Fourteenth Amendment Due Process Clause provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law ...." U.S. Const. amend. XIV, § 1, cl. 3. The Tenth Circuit has explained the proper analysis for measuring the constitutionality of a zoning ordinance under the Due Process Clause:

> before a zoning ordinance can be declared unconstitutional on due process grounds, the provisions must be clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.... [I]f the validity of the land classification is "fairly debatable" the legislative judgment must control.

*Messiah Baptist Church v. County of Jefferson*, 859 F.2d 820, 822 (10th Cir.1988) (citing *Village of Euclid Ohio v. Ambler Realty Co.*, 272 U.S. 365, 388, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926)). Additionally, when the church has not been denied the right to exercise religious preference strict scrutiny does not apply and the land use regulation "need only bear a substantial relationship to the general welfare." *Id.*

at 823; *see also Okla. Educ. Ass'n v. Alcoholic Beverage Laws Enforcement Comm'n,* 889 F.2d 929, 935 (10th Cir.1989).

### 2. Application.

■ As explained above, Cheyenne's zoning regulations do not violate Plaintiff's right to the free exercise of religion. Thus, Grace United has been denied a variance to operate a large scale alleged day care center under the guise of a religious education program in a residential neighborhood. That, standing alone, does not amount to a denial of the exercise of religious preference. The LR–1 zoning regulations only affect property interests and therefore need only bear a substantial relation to the general welfare. As explained above, there can be little doubt that Cheyenne's zoning regulations bear a substantial relation to the general welfare of the residents of Cheyenne. *See Young,* 427 U.S. at 80, 96 S.Ct. 2440 (Powell, J., concurring). There is nothing arbitrary or unreasonable about precluding an operation that would service up to one hundred children, for eighteen hours a day, in a section of town zoned for residential purposes; in fact, such a zoning regulation would serve to promote the health, safety, and general welfare of the residents of Cheyenne.

### B. Equal Protection Claim.

Defendants argue they are entitled to summary judgment on Plaintiff's equal protection claim because there is no evidence that Grace United has been treated differently than any other entity or that it was the victim of discriminatory treatment. (Defs.' Mot to Dismiss, at pp. 14–15). Plaintiff responds that by "treating Plaintiff's religious use of land differently and worse than other religious and non[-]religious uses of land, Defendants unconstitutionally discriminate against it in violation of the Equal Protection Clause of the Fourteenth Amendment". (Pl.'s Resp. Br., at pp. 21–22).

### 1. Equal Protection Standards.

The Fourteenth Amendment mandates that no state shall deny a person in its jurisdiction equal protection of the laws. U.S. Const. amend. XIV, § 1, cl. 4. The Equal Protection Clause seeks to guarantee that all similarly situated persons are treated alike. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). If the challenged statute does not make classifications based upon a fundamental right or a suspect class, the statute must survive only a rational basis standard of review. *Curley v. Perry,* 246 F.3d 1278, 1285 (10th Cir.2001) *cert. denied* 534 U.S. 922, 122 S.Ct. 274, 151 L.Ed.2d 201 (2001). In the land use context involving the zoning of churches, "absent evidence of purposeful discrimination based on religious status, the rational basis standard should apply." *Cornerstone Bible Church v. City of Hastings,* 948 F.2d 464, 472 n. 13 (8th Cir. 1991).

Under the rational basis test, Plaintiffs have the burden of proving that the legislative facts on which the statutory classification is apparently based could not reasonably be conceived as true by the government. *Okla. Educ. Ass'n,* 889 F.2d 929; *Nordlinger v. Hahn,* 505 U.S. 1, 15, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). Absent an invidious or gender-based classification, legislation is presumed to be valid and will be sustained if the classification drawn by the statute, if any, is rationally related to a legitimate state interest. *Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249. To determine whether classification is rationally related to a legitimate interest, "a court must consider the law's logical tendency to promote its stated goals as against its tendency to

impair other, more important, goals." *Coburn v. Agustin*, 627 F.Supp. 983, 991 (D.Kan.1985).

### 2. Application.

■■■ There is no fundamental right involved in this case, nor has a suspect classification been identified; in fact, Plaintiff has not even attempted to argue a fundamental right is involved or that it is suspect class. (*See* Pl.'s Resp. Br., at pp. 21–22). Rather, Grace United simply alleges that it was "treated differently and worse," but fails to identify any entity that was treated differently or better. Consequently, the rational basis test applies.

Under the rational basis test, Cheyenne's zoning ordinance is rationally related to its promotion of the general welfare of its citizens. Municipal zoning has been a common and accepted exercise of the police power to protect city residents from the effects of urbanization, overcrowding, and encroachment of commercial business for over three-quarters of a century. *See Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

Contrary to Plaintiff's suggestions, Cheyenne's zoning ordinance seeks to accommodate religious organizations. There is no dispute that Grace United can operate its Church, and has operated its Church, in a residentially zoned area for nearly forty years. Grace United could even seek a variance to operate a religious education program that instructed eleven to fifteen children at a time at its current location. However, Grace United had bigger and better plans for its religious education program, which too is permissible under Cheyenne's zoning ordinance. Yet, to operate such a large scale religious education program, Grace United would have to do it in one of the areas in the City properly zoned for such an operation. As the Board of Adjustment concluded, Grace United could not operate such a large scale religious education program in an LR–1 zoned area because it would interfere with the rights of other landowners within the neighborhood. Grace United has not presented any evidence of another entity, religious or otherwise, that is currently operating an education program, other than a primary or secondary school, with up to one hundred children in an LR–1 zoned area.

Grace United is not seeking to be treated like similarly situated institutions in Cheyenne; rather, it is seeking preferential treatment. Consequently, its Equal Protection Clause claim fails.

### C. Conclusion.

For all the aforementioned reasons, Defendant's Motion for Summary Judgment on Plaintiff's Third Claim for Relief—violation of 42 U.S.C. § 1983 and the Fourteenth Amendment—is **GRANTED.**

### *Conclusion*

In these troubled times, the Court recognizes the importance, more than ever, of protecting religious freedom; however, our constitutional system demands equality and does not permit the religion clauses to be used as a sword. *See* J. Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 627–34 (5th ed. 1891) (explaining that the federal government is barred from punishing or benefitting specific religions). In this case, Grace United sought to avoid the application of a facially neutral law of general applicability under the veneer of religious exercise without any evidence of discriminatory application. This our Constitution does not permit. Consequently, for all the aforementioned reasons, Defendants' Motion for Summary Judgment on Plaintiff's Second and Third Claims for Relief under 42 U.S.C. § 1983, the First Amendment, and Fourteenth Amendment, is **GRANTED.**

However, genuine issues of material fact exist as to whether Plaintiff can establish a claim under the more protective Religious Land Use and Institutionalized Persons Act. Therefore, Defendants' Motion for Summary Judgment on Plaintiff's First Claim Relief under RLUIPA and Plaintiff's Cross–Motion for Summary Judgment on that Claim are **DENIED**.

The Court notes that a trial date has not been set in this matter. The Court tentatively sets this matter for a jury trial on Plaintiff's remaining RLUIPA claim for March 17, 2003.